NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

OLAA SUGAR COMPANY, Limited and
ILWU Local 142, Respondents.

No. 15143.

United States Court of Appeals
Ninth Circuit.

March 12, 1957.

Theophil C. Kammholz, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel and Rosanna Blake, Washington, D. C., for petitioner.

Arthur G. Smith, Smith, Wild, Beebe & Cades, J. Edward Collins, James A. King, Bouslog & Symonds, Honolulu, Hawaii, and George Andersen, San Francisco, Cal., for respondents.

Before DENMAN, Chief Judge, and STEPHENS and POPE, Circuit Judges.

POPE, Circuit Judge.

Before us is the petition of the National Labor Relations Board for enforcement of its order against the respondents based on its findings of unfair labor practices. These practices concern the discharge of one Banez, a truck driver employee of Olaa Sugar Company.[1] While asserting that under no circumstances could their acts amount to violations of the National Labor Relations Act, respondents also contend that Banez was excluded from the provisions of the Act by its § 2(3), 29 U.S.C.A. § 152(3) which recites that as used in the Act, "the term 'employee' * * * shall not include any individual employed as an agricultural laborer * * *."

For reasons hereafter stated, we think that if employee Banez is not within this agricultural exclusion, then the finding of an unfair labor practice must be sustained. Hence we first address ourselves to the contention that this truck-driver employee was an agricultural laborer.

For a number of years Congress has added a rider to the appropriation for the Board reciting that none of the Board's funds "shall be * * * used in connection with investigations, hearings, directives, or orders concerning bargaining units composed of agricultural laborers as referred to in § 3(f)" of the Fair Labor Standards Act.[2] The question is whether Banez was employed in agriculture within the meaning of that Act.

The respondent Olaa is an Hawaiian corporation which is engaged in the growing and processing of sugar cane on the Island of Hawaii. It owns and cultivates 7418 acres of cane fields; it also purchases sugar cane from a number of independent growers whose cane fields totaling 6911 acres are located near or adjoining the company's fields.[3]

1. The Board found that the Union had caused Olaa, as employer, to discriminate against Banez, a non-union employee, on the basis of his non-union status, in a manner calculated and tending to encourage membership in the Union; that the Union thus violated § 8(b) (1) (A) and § 8(b) (2) of the Labor Relations Management Act of 1947, Title 29 U.S. C.A. § 158(b) (1) (A) and (b) (2), and that the employer in acquiescing and participating in this discrimination had violated § 8(a) (1) and (3) of the Act, Title 29 U.S.C.A. § 158(a) (1) and (3).

2. "Sec. 3. As used in this Act.— * * * (f) 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 15(g) of the Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." See 29 U.S.C.A. § 203.

3. Some of the independent growers leased their lands from the company, while others owned their lands outright. The company had written agreements with the independent growers whereby the latter agreed to sell it their sugar cane. These

In the process of harvesting the standing mature cane was first cut by crews of men who piled the cane on slings. Traveling cranes then moved through the fields to lift these piles and slings into trucks for transportation to the mill. The equipment which Banez operated was made up of a tractor-truck to which was attached a semi-trailer and a full trailer. This made a "train" 64 feet long overall, which moved on 26 wheels. It carried 16 to 18 of such piles of cane and as the piles averaged one and one-half tons this made a load of approximately 22 tons. The cane fields were crossed by a grid of private roads constructed at intervals 500 feet apart. There were 450 miles of these roads which were traversed by the trucks in hauling the cane from the fields toward the mill; 340 miles of these were in the company's own fields, and a substantial portion of the total hauls to the mill made use of these private roads exclusively. Where hauling was from fields near the mill it was not necessary to haul over public roads. Some of the fields from which cane was hauled were located several miles distant from the mill and were noncontiguous with the fields first mentioned as they were separated by non-tillable lava deposits. Public roads ran through all these areas of cultivated fields and connected the various groups of lands making up the company plantation. The evidence showed that Banez and the other truck drivers, in hauling cane from the more remote areas, would haul over the private roads to the nearest public highway and then over the public highway to the mill. The greater portion of all hauling was in this manner. The public highways were two lane hard surface roads which permitted more speed than was possible on the single lane unsurfaced private roads.

The Board held that the work of Banez and the other truck drivers was "industrial in character." It pointed to the fact that some of the fields from which cane was hauled were as much as 23 miles from the mill and that the more general practice was to drive from the private roads to the public highways; that the greater portion of the driving time was spent on those public highways; and that approximately one-half of the time of the truck drivers was spent in hauling the cane of the independent growers. The trucks were equipped so that they could be dispatched and controlled by a radio telephone system which was operated by a dispatcher who occupied a shack near the mill. Banez did not have any part in the loading of the cane upon the truck except that he drove the truck past the piles of cane as the traveling crane moved along and loaded the truck. The Board held on these facts that Banez was not employed as an agricultural laborer either when he was hauling the cane of the independent growers or while he was engaged in hauling the company's cane from its own fields. Accordingly the Board determined that Banez was not excluded from the coverage of the Act.

It is our view that in respect to his operations as a truck driver hauling one of these "trains" of sugar cane from the company's own fields to the mill, the case of Maneja v. Waialua Agricultural Co., 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040, would compel a conclusion that Banez was within the exemptive provisions relating to agricultural labor, just as were the railroad employees in that case who operated the railroad which transported cane from Waialua's fields to its mill. There the Court said, 349 U.S. at page 261, 75 S.Ct. at page 724: "* * * we cannot hold that merely because Waialua uses a method ordinarily not associated with agriculture—a railroad—to transport the cane from the fields to the mill, it has forfeited its agriculture exemption. Where a farmer thus uses extraordinary methods, we must look to the

contracts provided that the company ". . . will take delivery of the crop or crops of sugar cane now growing or to be grown during the term hereof, cut and piled by the grower (or cut and piled by the mill at his request and expense) on slings within 300 feet of a passable road."

function performed. Certainly no one would argue that the agriculture exemption did not apply to farm laborers who took the cane to the plant in wheelbarrows. There is no reason to construe the FLSA so as to discourage modernization in performing this same function."

There of course all of the sugar cane transported was grown by Waialua on its own lands. But the reasoning in Waialua would appear to be equally applicable to Banez whenever he was moving Olaa's cane from its own fields. It is true that Waialua's railway also hauled farm implements and laborers to the fields; but the circumstance that Banez' truck did not perform a similar function does not call for a different conclusion.

■■■ Nor does the circumstance that the trucks traveled a portion of the way over the public highway serve to distinguish the facts of this case from those in Waialua. It is common knowledge that even small farms are frequently bisected by public roads; even small farm operators frequently own or operate non-contiguous fields reached only by public roads. If such a farmer sent his truck driver to haul hay baled in a distant field to be stacked near the farm buildings, the operation would not cease to be an agricultural one even if the employee made some use of the public road on his trip. If that be true in the case of a small farmer, the same thing should be true here for as stated in Waialua "nowhere in the Act was any attempt made to draw a distinction between large and small farms."

Proper characterization of the operations of Banez while hauling cane from the fields of independent operators presents a more difficult question. The labor union has argued that all of the hauling by Banez was agricultural in character within the meaning of the Fair Labor Standards Act because it was a part of the harvesting of agricultural commodities. The record indicates that the independent growers here did not themselves cut or pile their cane but that as provided as an alternative in the contracts (footnote 3, supra), it was cut and piled by the company at the request of the grower and at the latter's expense. The trial examiner's findings which the Board accepted, recite that "The entire cost of harvesting an independent grower's cane was borne by the grower, but the labor was furnished by the company through its own labor force, which consisted of cane cutters."

The rather persuasive argument is made that whether title to the grower's cane passed to Olaa at the moment it was cut or after it was piled, yet the circumstances show that it was Olaa which was doing the harvesting not only of its own but of the independent grower's cane as well. Under the decision in Farmers Reservoir Irrigation Co. v. Mc-Comb, 337 U.S. 755, 762, 69 S.Ct. 1274, 93 L.Ed. 1672, "harvesting" of any agricultural commodity is included within the term "agriculture" in its primary meaning; it is within the first branch of the statutory definition as set forth in that case. Recently in Holtville Alfalfa Mills, Inc., v. Wyatt, 9 Cir., 230 F.2d 398, 403, this court was dealing with the question of the application of the Fair Labor Standards Act to truck drivers who were hauling chopped alfalfa from the field where it was cut and chopped to a mill where it was processed into dehydrated blocks of pulverized feed. It was noted that alfalfa when chopped is subject to spoilage unless immediately dehydrated. In that respect it is like cut sugar cane which, as noted in the Waialua case, supra, is extremely perishable and must be processed promptly. In the Holtville case this court had occasion to say: "Transportation of crops so that spoilage can be prevented is usually considered part of harvesting." Under that theory there is plausibility in the argument that the transportation even of the cane grown on the independent growers' fields was a part of the harvesting which Olaa had commenced when it sent its own crews into those fields to cut the cane.

However, we are persuaded by what was said in the Waialua case, supra, [349 U.S. 254, 75 S.Ct. 724] that we are

not required to accept that contention here. There the Court carefully refrained from characterizing the transportation of the sugar cane as part of harvesting. It treated the transportation there involved as coming within what was referred to in the Farmers Irrigation case, supra, [337 U.S. 755, 69 S.Ct. 1278] as the secondary or broader portion of the Act's definition of agriculture, that is to say, "practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with 'such' farming operations." It compared Waialua's transportation activities with " 'delivery to storage or to market or to carriers for transportation to market,' "—language used in the second portion of the definition, and said: "Being performed 'on a farm as an incident to or in conjunction with such farming operations,' this activity is a necessary part of the agricultural enterprise". We conclude that the Board was not required to find as a fact that this hauling was "harvesting", and we are not required to hold it such as a matter of law.

Our view, however, is that this hauling from the fields of the independent growers must be treated differently from the hauling from Olaa's own fields. We have noted that there are here two groups of farming operations—one by Olaa on its farm, and the other, the farming operations of the independent growers. Since the teaching of Waialua is that we must approach these transportation operations with the inquiry whether they are "incident to or in conjunction with" farming operations, we must note that under the language of the Act (footnote 2, supra), these practices must be performed as an incident to *such* farming operations. Without doubt Olaa is a farmer and its own cane lands constitute a farm, but the hauling of the cane from the independent growers' fields cannot be said to be an incident to *such* farming operations, that is to say, Olaa's farming operations. This we believe is in line with the decision in Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 18.

In declining to recognize that the hauling of the cane from Olaa's own lands to the mill would under the Waialua decision come within the agricultural exemption, the Board placed much emphasis upon the fact that the dispatcher's shack was located near the mill. The Board seemed to be of the view that this made the truck operators mill employees. We disagree with this view. The location of that shack was the natural and most convenient one for the control of hauling operations. Necessarily the hauling converged in the vicinity of the mill, and the truck drivers had to depart from that point. More significant than this is the fact, alluded to by the Board, that "the company's transportation section is considered by the company as being part of its harvesting department."

Again, Mr. Mair, the company's harvesting superintendent, regarded by the examiner and the Board as a fully trustworthy witness, testified that truck driver Banez was within his jurisdiction. Thus Banez and the other truck drivers were under the supervision and control of the harvesting superintendent. We think that in overemphasizing the location of the dispatcher's shack the Board was improperly relying on the case of Calaf v. Gonzalez, 1 Cir., 127 F.2d 934. In the Waialua case the Supreme Court referred to Calaf and held that neither it nor the Bowie case, supra, was apposite. One reason why Calaf is no more apposite here is apparent from an examination of the later case of Vives v. Serralles, 1 Cir., 145 F.2d 552, 555, where two groups of employees engaged in transporting sugar cane from the fields were held to be engaged in transportation as an incident to farming and hence within the agricultural exemption. There the same court which decided the Calaf case distinguished it. Calaf had treated the transportation of sugar cane as there carried on as an "incident to milling rather than to farming." [127 F.2d 936] But in Vives the court noted that the plaintiffs in group one and those in group two were all employed and paid by the defendant's field department,

whereas in Calaf the plaintiffs were all paid by the mill. It was held that the work of both groups was " 'transportation as an incident to farming'." Plainly this is the distinction which the Supreme Court had in mind when it said in referring to Calaf [349 U.S. 254, 75 S.Ct. 724]: "The same Court of Appeals warned that a different problem would be present if the heart of the transportation system and the situs of the employment of workers were located at the plantation."

It is our opinion that the facts here resemble those in Vives, supra, rather than those described in Calaf. The fact that Banez and the other truck drivers were under the jurisdiction and direction of the harvesting superintendent and were regarded by the company as being a part of its harvesting department, more than offsets the comparatively insignificant fact that the dispatcher's shack was near the mill. The most important portion of the company's fields were also near the mill.

■ There is a further important reason why the decisions in the Bowie and Calaf cases cannot be determinative here. It must not be overlooked that although the Fair Labor Standards Act definition of agricultural employment has been imported by the appropriation bill riders into the machinery to be used by the Labor Board in carrying out its functions, yet the Board does exercise and is required to exercise a wide discretion which is not available to a court when it is called on to enforce the provisions of the Labor Standards Act. That exercise of discretion by the Board is appropriate for an administrative agency which is charged with effectuating a general Congressional policy. Heretofore both the courts (in Fair Labor Standards Act cases), and the Board (in representation cases before it), have had to deal with employees who perform both exempt and non-exempt work, or whose exempt and non-exempt work is commingled. The results and the approach have not been the same. In such instances the courts construing the Fair Labor Standards Act have held the exemption inapplicable to such an employee. North Shore Corp. v. Barnett, 5 Cir., 143 F.2d 172, 175; Mitchell v. Stinson, 1 Cir., 217 F.2d 210, 217. It should be noted that Bowie and Calaf were both cases of that kind, and that in each of them the employees involved were dealing with sugar cane produced on the farms of independent growers as well as the sugar cane grown by the employer on its farm. Under the last cited court decisions which dealt with the Fair Labor Standards Act it was appropriate to treat Bowie and Calaf as non-exempt.

■ In contrast, the functioning of the Labor Board under the provisions of its applicable Act is quite different. As this court observed in Haleston Drug Stores v. N. L. R. B., 9 Cir., 187 F.2d 418, 420, the Act did not confer private rights; the Board's proceedings are not for the vindication of such rights, but its function is to give effect to the declared public policy of Congress. To this end it has large discretionary authority in respect of its assertion of jurisdiction. In Haleston we noted that the Board without judicial challenge had long acted upon the assumption that it could decline to act in a given case "if in its reasoned judgment the policies of the Act would be best served by that course."

In National Labor Relations Board v. Denver Building & Const. Trades Council, 341 U.S. 675, 684, 71 S.Ct. 943, 949, 95 L.Ed. 1284, the court said: "Even when the effect of activities on interstate commerce is sufficient to enable the Board to take jurisdiction of a complaint, the Board sometimes properly declines to do so, stating that the policies of the Act would not be effectuated by its assertion of jurisdiction in that case." [4]

In short, in its consideration of questions presented to it under the Act, the

---

**4.** See also the cases cited in the footnote to the opinion of Mr. Justice Jackson in United States v. Five Gambling Devices, 346 U.S. 441, at page 447, 74 S.Ct. 190, at page 192, 98 L.Ed. 179.

Board determines not merely its power to act but "the propriety of its exercise on a given state of facts." Consolidated Edison Company of New York v. National Labor Relations Board, 305 U.S. 197, 223–224, 59 S.Ct. 206, 214, 83 L.Ed. 126. In employing its right to determine the propriety of exercising its power on a given state of facts,[5] the Board at the time the present case came before it, had established a policy with respect to the application of the Labor Management Relations Act to employees who divided their time between agricultural and non-agricultural employment. That policy was declared by the Board in a series of cases which raised the question whether certain employees were agricultural employees and thus excluded under the Act from proposed bargaining units.

In Hershey Estates, 112 N.L.R.B. 1300, 1302, the policy was stated as follows: "The Board has recently held that employees who divided their time between agricultural and non-agricultural activities, spending a substantial part of their time in performing agricultural duties, will be considered 'agricultural laborers' and excluded from units of employees covered by the Act."

In Clinton Foods, Inc., 108 N.L.R.B. 85, a certain group of employees called "flat drivers", spent one-third of their time in performing a completely agricultural function. The Board held that even assuming that these employees divided their time between this agricultural and other non-agricultural employment, they must be deemed agricultural laborers and excluded from the unit.[6]

In arriving at its decision in this case, the Board found no occasion to consider whether it proposed to follow the policy stated in the cases just cited, for as we have indicated, it held that no part of the operations of Banez were agricultural in character. A dissenting member of the Board who took the view, correctly, we think, that under the decisions in the Waialua case, the Board must find that the drivers were agricultural employees to the extent that they hauled sugar cane grown on the company's own land, pointed to the Board's decision in the Clinton case and expressed his view that the Board should follow that established Board doctrine and hold that Banez was like other employees who divide their time between agricultural and non-agricultural employment, and since he spent a substantial part of his time in performing agricultural duties, he should be deemed to be within the exemption.

■ It is plain that whether the Board should or should not apply the

---

5. Such, for instance, as the Board's refusal to take jurisdiction of cases involving the building and construction industry prior to the change of policy which was upheld in National Labor Relations Board v. Denver Building & Const. Trades Council, supra. See National Labor Relations Board v. Guy F. Atkinson, 9 Cir., 195 F.2d 141, 143, footnotes 3 and 4.

6. "As noted above, it is clearly established by the record that the 'flat drivers' spend at least one-third of their time driving trucks whose operation, being confined to the farm, constitutes a completely agricultural function. In an analogous situation where the individuals concerned spent one-fourth of their time performing the duties of 'guard' (a category which, like that of 'agricultural laborers,' is a statutory exclusion), the Board, in a recent case, considered the issue as to whether individuals working part time in the excluded category could be included in the production and maintenance unit. In that case, the Board decided that such individuals must be regarded as falling within the statutory exclusion, although they spent less than half their working time in the excluded category. We believe that the policy which prompted our decision in the Walterboro case, noted above, is equally applicable to a category that is excluded by statute from the definition of 'employee' under the Act. Accordingly, even assuming arguendo that the employees herein involved are partly engaged in a nonagricultural work, we find that those employees who divide their time between agricultural and nonagricultural employment must, to the extent that they spend a substantial part of their time in an agricultural function, be deemed agricultural laborers within the meaning of the Act and are, therefore, to be excluded from the unit."

so-called "Clinton Foods doctrine" in this case, is a matter within the sole discretion of the Board. Clearly, too, it is within the power of the Board to abandon that policy whenever it sees fit to do so; and since no problem such as that which was presented in the Guy F. Atkinson case, supra, arises here, we know of no reason why the Board must continue to apply its previously settled policy in this particular case.

But the Board has failed to exercise its discretion in this respect because it has not perceived that this is a case dealing with employees who divide their time between agricultural and non-agricultural activities, spending a substantial part of their time in performing agricultural duties. We think that the Board was required here to pass upon this question, and that its failure to exercise its discretionary authority amounted to agency action unlawfully withheld within the meaning of Title 5 U.S.C.A. § 1009 (e). Because the Board thus failed to take into account all factors presented here, including the circumstance that Banez was at least in part engaged in an agricultural activity, its determination was not in accordance with law and it failed to observe required procedure.

Should the Board upon the remand which we are required to make here determine that it should not in this case apply the so-called Clinton Foods doctrine, then and in that event its further determination that the respondents were guilty of unfair labor practices must be sustained. The Board's decision upon that aspect of the case is reported at 114 N.L.R.B. pp. 674–676. The conclusions stated there with respect to the unfair labor practices are amply sustained by the evidence. In the summer of 1953 the Sugar Company and all of its 1100 employees were contemplating the probability of a reduction in the total work force which would come about when the company installed mechanical equipment for the cutting of sugar cane the following December. Banez, who was born in the Philippine Islands, and some other Filipino employees, were concerned

lest the Japanese officers of the union use their positions to discriminate against them in respect to layoffs or opportunities for jobs on the basis of their nationality alone. Three of them, Banez, who had dropped his union membership, and Dela and Revera who were members, began to circulate petitions among other employees seeking a general meeting of the union to clarify misunderstandings between the Filipino employees and the Japanese officers of the union. The officers of the union, learning of the circulation of these petitions, reported to the company the circumstances above stated, and asked the latter to discharge Banez. The request was based upon a provision of the union contract which read as follows: "Any claim by the Union that action on the job of a non-union employee covered by this agreement is disrupting harmonious working relations may be taken up as a grievance. Repeated disruption of harmonious working relations shall be grounds for discipline or discharge." The company acceded to this demand and Banez, who had no notice of the demand, or opportunity to be heard, was discharged. The other employees who had circulated like petitions, but who were union members, were not discharged or otherwise disciplined by the company, and no request respecting them was addressed to the company by the union. Subsequently the company belatedly undertook to justify Banez's discharge on the ground of an alleged poor work record. The examiner, however, found on the basis of credible evidence, that the discharge was made solely pursuant to the quoted paragraph of the contract and not because of a poor work record or for cause.

The Board agreed with the examiner that this provision of the contract, directed as it is solely against non-union employees, was illegal upon its face. It is unnecessary to inquire whether under any conceivable set of circumstances there might be justification for invoking such a provision against a non-union employee, for we thoroughly agree with the Board that the provision was dis-

criminatorily enforced against Banez. The record is plain that the union's officials in invoking the provisions of that paragraph were not concerned with the problem of disruption of the business of the company, or disruption of hamonious working relations between the company and its employees, but were merely undertaking to exert power to suppress criticism of themselves. No such action was taken with respect to the members of the union who did exactly what Banez had done, and at the time of the hearing those union members were still employed. What happened to Banez was obviously well calculated to teach other non-union members that it would be better for them if they belonged to the union. These facts bring this aspect of the case squarely within the rule of Radio Officers' Union, etc. v. National Labor Relations Board, 347 U.S. 17, at page 52, 74 S.Ct. 323, at page 342, 98 L.Ed. 455, in which the Court said: "Since encouragement of union membership is obviously a natural and foreseeable consequence of any employer discrimination at the request of a union, those employers must be presumed to have intended such encouragement."

On the date this opinion was ready for signature our attention was called to the Board's decision of March 1, 1957, in the case of H. A. Rider & Sons v. Local No. 912, where the Board did what we have criticised it for not doing here. It there faced and determined the question whether its Clinton Foods doctrine should be applied in that particular case where a representation problem was involved. There the Board, reevaluating its Clinton Foods decisions, said "[W]e find that since the employees in this case spend upwards of 70 percent of their time during the year in non-agricultural employment they are properly included in the unit found appropriate." At the same time the Board left open the question whether this new approach to the Clinton Foods doctrine would be applied in a case where, as here, substantially

less than 70 per cent of the employee's time was spent in non-agricultural work.[7] The Board said, "We find it unnecessary to lay down a general rule in this case as to what proportion of time spent in non-agricultural work is necessary for inclusion in the unit."

Prior to the Walterboro decision of October 30, 1953, which the Board followed in Clinton Foods, the Board did not accept what is here called the Clinton Foods doctrine, in any case. We cannot here undertake to predict, for the Board, which way the pendulum will now swing, or whether on the different facts here presented the Board will apply a policy of exclusion. For this reason the occasion for remand remains, notwithstanding the Rider decision.

The case is remanded to the Board for further proceedings herein and with directions to make the further determination herein called for.

---

7. The examiner found: "The truck drivers spend about half their time hauling cane from the Company's fields, and half their time from the independent growers' fields."