NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

STRAIN POULTRY FARMS, INC., Respondent.

No. 25692.

United States Court of Appeals Fifth Circuit.

Jan. 3, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Morton Namrow, Atty., NLRB, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Glen M. Bendixsen, Atty., National Labor Relations Board, for petitioner.

Warner S. Currie, Swift, Currie, Mc-Ghee & Hiers, Atlanta, Ga., for respondent.

Thomas T. Purdom, Decatur, Ga., William B. Spann, Jr., Atlanta, Ga., amici curiae.

Before JOHN R. BROWN, Chief Judge, TUTTLE, Circuit Judge, and FISHER, District Judge.

TUTTLE, Circuit Judge:

The NLRB is here petitioning for enforcement of its order requiring the respondent to cease and desist from unfair labor practices found, and from in any other manner interfering with the employee's rights as granted by the NLRA. Further, the order requires respondent to reinstate and make whole an employee found to be discriminatorily discharged, to bargain with the union and to post notices.

The respondent, Strain Poultry Farms, Inc., ("Strain"), admits there is substantial evidence in the record to support the Board's findings relative to the unfair labor practices charged. However, it asserts that the Board had no power to act because the employees concerned were agricultural laborers and hence exempt from the NLRA.

The Southeastern Poultry and Egg Association has filed a brief as amicus curiae arguing substantially the same position as the respondent.

A reading of the record shows that there is substantial evidence to support all the Board's findings, and its order relative to the unfair labor practices. Therefore, we have only the single issue, which, briefly stated follows:

Respondent's chickens are raised to market size by independent growers who supply the henhouses and who feed, water and generally look after the birds. Respondent supplies the birds and retains ownership of them. It also supplies the feed and medicine and its employees provide specialized services such as debeaking and vaccinations. In light of these facts, are respondent's truckdrivers, who haul the chickens to market, "agricultural employees" within the meaning of 29 U.S.C.A. § 203(f) which defines agriculture to include the raising of poultry and any practices performed by a farmer or on a farm as an incident to or in conjunction with such poultry raising including delivery to market?

The facts are not in dispute. The respondent is a poultry farm operation which has hatching and growing facilities in Dalton and Acworth, Georgia. It is engaged in the production and marketing of broiler and fryer poultry which it raises and then sells to processers. It has two hatcheries, the principal one at Dalton and a smaller one at Acworth. The small hatchery hatches the pure line chicks, which produce the males and females that become the parents of the broilers. As only part of these chicks grade out well enough to be breeders, some are sold for food consumption. The principal hatchery at Dalton produces the baby chicks that subsequently grow to broiler or fryer size. The corporation has its own farm on which a portion of these chicks are raised to maturity. It hires independent contract haulers to deliver these birds to the processing plants. In addition, some of these baby chicks are hauled to other farms, not owned by the respondent, where they are raised to market age. By dispersing the chicks in this manner, protection against disease is achieved. This is a practice generally followed in the poultry business in the Southeast.

Respondent is organized into three divisions. First, the egg producing division is to produce an egg supply for the hatchery and the replacement birds needed to insure the flow of eggs. That is, this division produces the eggs which become both broilers and laying hens. Chicks selected for the laying operations are grown by a separate group of farmers under the control of this division. These farmers are "separate" as opposed to the growers who raise the chicks which become the broilers. This division employs three or four "coop" truck drivers who haul the poultry between

farms and when not engaged in this activity also haul "salvage" poultry to market, i. e., to the respondent's processing plant customer. These drivers are not those whose coverage or exemption is in question.

The seventeen drivers in question are employed in the broiler division, described more fully below. The broiler division drivers are engaged fulltime in hauling to market, while the egg production division drivers do this only on a parttime basis. It appears that the drivers in these divisions use similar equipment and when the egg production division drivers are hauling birds to market perform basically the same job. They are sometimes used as replacements for the broiler division drivers. However, the broiler division drivers do not haul the birds from grower to grower.

Respondent's second division is the hatchery division. It receives the eggs from egg production, hatches them, and delivers the chicks to the broiler grower. This division also employs truck drivers, who, using smaller trucks, transport the eggs from the egg producer's farms to the hatchery and the small chicks from the hatchery to broiler growers. These drivers are also not involved in this case.

As stated above, the third division is the broiler division which has the responsibility of growing broilers from day-old chicks to market age. As indicated, this growing is done mainly by farmers under contract with the respondent. It is here that the seventeen drivers involved in this appeal are employed. They are employed in Dalton and Acworth, the Dalton group being somewhat larger. The drivers may work at either location, depending on the scheduling needs of the respondent. These drivers operate large expensive "coop" trucks. They proceed as directed to the growers' farms where the birds are loaded on the truck. The actual catching of the birds and carrying them to the truck are done by contractors who are paid by respondent on the basis of a given price per thousand birds caught. The driver is responsible for making sure that the birds are properly placed in the coop on the truck by these "catchers." The coops apparently are removed from the truck a few at a time and placed on the ground near the trucks. The "catcher" places the birds in the coop and then, under the direction of the driver, the coop is placed on the truck. From here, the trucks are driven to the respondent's customers—processing plants—in Atlanta and Macon. While performing their duties, the drivers in the broiler division work independently without direct supervision. The drivers have no responsibility for repair and maintenance of the trucks.

The independent farmers feed the birds food purchased by and delivered to them by the respondent. The grower provides the facilities for growing the birds, feeds, waters and in general takes care of them until they are ready for market. The respondent has employees (not the truck drivers in question) who go from farm to farm to provide such services as debeaking and vaccinating. The risk of market loss remains at all times with the respondent. The independent growers are paid a minimum guarantee per pound with increased compensation if they exceed the minimum standards.

The NLRA provides that "the term 'employee' * * * shall not include any individual employed as an agricultural laborer." 29 U.S.C.A. § 152(3). Since 1946, Congress has added a rider to the NLRB's appropriation bill providing that no part of the appropriation shall be used in connection with bargaining units composed of "agricultural laborers" as defined in section 3(f) of the FLSA (Fair Labor Standards Act). "Agriculture" is there defined to include:

Farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural

commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market. 29 U.S.C. § 203(f).

Early cases interpreting Section 3(f) presented the issue of whether the agricultural exemption was to include organizations which, though differing greatly from the traditional family farm, nevertheless produced agricultural products. The answer was "generally yes." Even though the organization employed hundreds of people, and contained its own transportation, maintenance and processing facilities, it still was a farm. Yet, not everything which aids in the eventual marketing of agricultural products is included within the exemption. The difficulty is where to draw the line. As stated by the Supreme Court:

> "Both in the employments which the Fair Labor Standards Act covers and in the exemptions it makes the Congress has cast upon the courts the duty of making distinctions that often are bound to be so nice as to appear arbitrary in relation to each other. A specific situation, like that presented in this case, presents a problem for construction which may with nearly equal reason be resolved one way rather than another." Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 770, 69 S.Ct. 1274, 1282, 93 L.Ed. 1672 (1949).

It seems clear that under Section 3(f) if a farmer raises his own birds to market age on his own farm and then hauls them to the processing plant, the employees who do the hauling would be "agricultural employees". On the other hand, if the employees concerned work for a company which has no farms, has no hatcheries, etc., and is in no way involved in raising poultry, but simply purchases mature birds from farmers and then hauls them to the processing plants, here the exemption would not apply to the drivers. The question here is which is Strain more like?

Two Supreme Court cases provide the broad outline for deciding the case at bar. The first is relied upon by the National Labor Relations Board and the second by the respondent.

In Farmers Reservoir & Irrigation Co., supra, the irrigation company owned several large canals in Colorado through which water diverted from the Colorado River was distributed to farmers. These farmers, who were the shareholders in the mutual company, were assessed annually to pay for the cost of operating the system. The company employees operated and maintained the canals, reservoirs and headgates. The issue was whether these employees were engaged in agriculture so as to come within the Section 3(f) exemption. The Court said that in this case the fact that the company was owned by farmers was not dispositive. The question was whether the company's activities were separately organized as an independent, productive operation or were carried on as part of the agricultural function.

The Court noted that the definition set forth in Section 3(f) has two distinct branches.

> First, there is the primary meaning. Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning. Second, there is the broader meaning. Agriculture is defined to include things other than farming as so illustrated. It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with 'such' farming operations. 337 U.S. 755, 762–763, 69 S.Ct. 1274, 1278.

After setting forth its "primary and secondary" definition of Agriculture, the Court said it was clear that the company

was not engaged in agriculture in the primary sense of cultivating, growing, or harvesting. It simply supplied the water to the farmer and he used it for farming. Furthermore, it was not, in the secondary sense, a practice performed as "an incident to or in conjunction with farming" because the farm work performed by the irrigation company employees was not done by farmers or on a farm.

The second Supreme Court case is Maneja v. Waialua Agriculture Co., 349 U. S. 254, 75 S.Ct. 719, 99 L.Ed. 1040 (1955). The company was a large, integrated operation growing, harvesting and processing sugar cane at its plantation in Hawaii. It employed over 1,000 persons, many at specialized tasks. The company owned a railroad in which the cane was hauled from the fields to the company's processing plant. The court held that the railroad workers fell within the agricultural exemption. No distinction could be made between large and small farms and as there could be no question that the exemption would apply to farm laborers who took the cane to the plant in wheelbarrows, the railroad employees, who performed the same function, were also exempt. The Court noted further that if the company had not owned the mill, its transportation activities from field to mill would have come squarely within the agricultural exemption covering "delivery to market." By a parity of reasoning the Court also held that the employees who repaired the mechanical implements used by the company in its farming operations were also exempt.

The Court noted that the question of the employees who worked in the processing mill presented a closer question. The issue was whether the mill process was incident to or in conjunction with the company's farming operation or whether the company was a farmer that was conducting a sugar processing business on the side. Or, put another way, was the milling operation part of the agricultural venture? The Court noted there were many relevant factors to con-

sider, including, among others: (1) the size of the farming operations vis a vis the milling activity; (2) the investment in the farming operation as opposed to the milling operation in terms of time and money; (3) the extent to which ordinary farm workers perform the activity in question and the degree of separation by the employer between the various operations; (4) the degree to which the activity in question is ordinarily done by farmers. Applying these factors to the case (as well as others not relevant here), the Court said the question would be extremely close in gauging whether this milling operation is farming or manufacturing. However, the Court then went on to consider factors which applied solely to sugar cane milling and found the mill operations were not exempt. The Court noted that the status of farmers milling their own sugar cane vis a vis the agricultural exemption was probably sui generis.

To a considerable extent, this case provides the basis for deciding the case at bar. To paraphrase Maneja, the issue here is whether the truck driving duties were incident to or in conjunction with Strain's poultry raising operations or whether Strain was a poultry raiser who was conducting a trucking operation on the side. Or, phrased differently, was the trucking operation part of the poultry raising venture?

Clearly, the Board views the trucking operations as separate from the poultry raising venture. Unfortunately, the Board, whose discussion of the exemption issue is limited to the last four pages of its brief, does not discuss Maneja.

In its decision, the Board found that the coop drivers were "engaged in hauling coops to independent farms and chickens from independent farms to market." Applying the rule as that "a truck driver is an agricultural laborer to the extent he is engaged in regularly hauling farm produce from his employer's own farm, but not an agricultural laborer to the extent he regularly hauls produce for his employer from an inde-

pendent grower's farm," the Board held that the coop drivers were not agricultural laborers.

At first glance, it would seem that Section 3(f) directly applies to the work performed by the truck drivers. Agriculture is defined to include the raising of poultry and includes any practices incident to or in conjunction with such poultry raising including delivery to market.[1]

The NLRB seeks to avoid this apparent direct application of the statute by its argument that the agricultural exemption does not include employees of an independent and separately organized business enterprise not subject to the farmer's control. In Farmers Reservoir & Irrigation, supra, the Court said:

> The question is whether the activity in the particular case is carried on as part of the agricultural functions or is separately organized as an independent productive activity." 337 U.S. 755, 761, 69 S.Ct. 1274, 1278.

Here, the NLRB argues, the coop drivers perform work as an incident to or in conjunction with respondent's trucking activities for marketing poultry rather than to the operations of any farmer or farm.

Closely related to the argument that the employees worked for respondent's separate trucking activity is the Board's assertion that the birds are not raised by the respondent. If the birds are not raised by respondent, it becomes more like the irrigation company—it provides a necessary agricultural service but it is not engaged in farming activities. The NLRB stresses that, in its view, the independent farmers raise the birds and respondent has little to do with them; that the drivers are hired by the respondent, not these independent farmers, and appear on respondent's payroll as a separate division "whose function is the de-

livery of poultry for sale"; that the truck drivers do not work on the farms directly involved in raising chickens; and they report to and from work at respondent's garages. This, says the Board, means that the work is not incidental to or in conjunction with farming.

The Board says this is not a case where a farmer is delivering to market poultry which he has raised; this is so because here respondent's drivers deliver the results of someone else's farming efforts—the independent growers; they do not deliver the results of respondent's labors. The argument is that the fact that respondent uses the independent growers destroys its claim to having raised the birds; that respondent rather is more akin to the purchaser of the birds.

Respondent, of course, disputes the Board's argument that the chickens are raised by independent growers. It points to the fact that it supplies the feed and a number of follow-up services designed to insure the growth of the birds. At no time does respondent part with ownership of the birds and it retains the risk of their loss throughout the entire process. It says that the responsibility of the division which employs the drivers includes growing the broilers from day old chicks to market age as well as transporting them to market. It assumes the risk of market fluctuations which would affect the price of birds. Therefore, respondent says it is clear that it is, in fact, a farming operation within the meaning of Section 3(f).

Respondent also points out that "delivery to market" is within the statutory definition and it says that is exactly what its drivers do. It says the Board failed to view its operations as a totally integrated farming operation when it viewed the truck drivers as performing solely a transportation function, sepa-

---

1. Although most of the driving obviously does not take place "on a farm" and the drivers would not appear to be "farmers" courts have held that employees who drive trucks for farmers delivering their goods to market are nevertheless within the agricultural exemption assuming, of course, the other requirements for exemption are met. NLRB v. Olaa Sugar Co., (9th Cir., 1957) 242 F.2d 714.

rate from the rest of respondent's farming operations. Because the respondent never parted with ownership of the birds, respondent says they were the product of its farming operations and not the product of independent farmers. The birds hauled by the drivers are respondent's birds, not those of an independent grower.

In its amicus brief, the Association argues that the legislative history of the FLSA and the cases construing it show that "agriculture" is broadly defined and includes delivery to market, even when done by employees who perform no other tasks. Furthermore, it is clear that the fact that Strain is a large, assemblyline type operation does not destroy its agricultural status under the statute.

The major cases relied upon by the respondent (in addition to Maneja, supra), although distinguishable on some grounds, generally support its position.

The first is Wirtz v. Tyson's Poultry, (8th Cir., 1966) 355 F.2d 255. Tyson's Poultry was engaged in the processing and marketing of eggs. The employees in question assembled, graded, sized, packed and shipped eggs. The eggs were obtained from two sources, Tyson's own farms and three independent growers. Tyson's provided these independent growers all the birds which laid the eggs and the supplies necessary to maintain them and it supervised an egg pick-up program. The growers provided the premises, labor and certain equipment for the preservation of the birds. The growers made no important decisions involving the birds and assumed none of the risks involved in the egg market. The issue in the case was whether the employees of Tyson's Poultry came within the agricultural exemption. Only the eggs produced by the independent growers were considered by the court because of the rule that if there was both exempt and non-exempt work involved, there was no exemption. The government sought to establish that the handling of the eggs produced by the three independent growers rendered the operations of all of Tyson's Poultry employees non-agricultural. The Court of Appeals held that all employees were employed by a single and completely integrated farming operation and therefore, they were agricultural employees. Initially, it should be noted that this case is distinguishable in that it involved all the employees of the corporation, not just, as here, truck drivers. However, the case does give support to the respondent insofar as that court recognized the "integrated farming operation" which was involved and rejected the government's contention that the presence of the independent growers rendered the whole operation non-agricultural. The court found no basis for segregating the egg handling and processing functions from the entire enterprise so as to render it non-agricultural leaving only the remainder of Tyson's operations exempt. It, therefore, accepted the district court's finding that the entire operation was an integrated farming unit notwithstanding the involvement of the three independent growers. All the farming done in the case was viewed as that of Tyson's and but for their investment the independent growers would arguably never have raised the egg-producing birds themselves. Here, as respondent points out, the contract growers have a similar relationship to Strain Poultry farms as the egg producers had to Tyson's. Furthermore, the work done by the contract growers is an integral part of Strain's activities in producing broilers for market.

Next, respondent cites Miller Hatcheries, Inc. v. Boyer, (8th Cir., 1942) 131 F.2d 283. In this early FLSA case, the question was whether a commercial hatchery, located in an urban setting, could constitute the "raising of poultry" within the meaning of Section 3(f). The court noted that there was much to be said for the argument that such plants were so far removed from normal farming operations that the reasons Congress found which supported the agricultural exemption did not apply. However, the court rejected the argu-

ment and held the plant was covered by the exemption. It placed great stress on the fact that the Wage and Hour Administrator had, since passage of the FLSA, construed the statute so as to include such hatcheries within the definition set forth in Section 3(f).

Finally, respondent relies upon Mitchell v. Georgia Broiler Supply, Inc., 186 F.Supp. 341 (N.D.Ga.1960). The company purchased baby chicks and put them with independent growers. The company retained title to the chicks. When the chicks were ready for market, the company employees caught and cooped them and loaded the coops on trucks owned by poultry processors. The company also operated a feed mill where it ground and mixed the food supplied to the independent growers. This feed was hauled by company employees in trucks to the growers. Company employees also examined and treated the chicks for disease while they were being grown on the independent farms and in other ways provided services to the growers so that the chicks could be successfully matured. The question was whether the employees who drove trucks, went to the farms and worked in the feed mill were agricultural employees. The court held that the raising of poultry was within the primary definition of agriculture set forth in Section 3(f) and that the work performed by the employees was incident to or in conjunction with such raising in that it involved preparation of the birds for market.

The NLRB brief makes no mention of any of these cases.

Taken together, these cases would seem to establish that Strain is engaged in farming as that term is used in the primary definition of Section 3(f). The fact that Strain hired the independent growers to raise its birds and contract loaders to catch the birds for loading onto its trucks, would not seem to destroy its claim to having raised the poul-

try. Furthermore, the trucking activities were part of Strain's poultry raising venture. They were performed incident to or in conjunction with Strain's poultry raising operations and Strain was not a poultry raiser conducting a trucking operation on the side. The trucking operation was a part of an integrated poultry raising operation and, although unlike poultry farms of the past, it is today a typical broiler raising operation. The trucking operation does not appear inordinate in size, investment or time in relation to the rest of the operation. Respondent's method of transportation to market seems common enough among poultry raisers and, although the drivers perform few typical farm laborer duties this is not, in itself, sufficient to warrant the finding that this was a separate trucking business.

The cases cited by the Board can be distinguished. Farmers Reservoir & Irrigation is readily distinguishable. In The Farmers Reservoir & Irrigation case, supra, the Court held that the company was not even engaged in farming in its primary sense. Such is not the case here. The Court only reached the discussion of whether the employees were covered in a secondary sense because of the argument, rejected by the Court, that as the company was owned by farmers, the employees were farmers because they were employed by farmers.

NLRB v. Gass, 377 F.2d 438 (1st Cir., 1967), is also distinguishable. In that case, the court noted that it was significant that the drivers were not employed by the farmers nor were they under their control. The Court said that the delivery of poultry feed was analagous to the delivery of electricity or water to farmers found to be non-agricultural in Farmers Reservoir & Irrigation, supra.[2]

In Mitchell v. Huntsville Wholesale Nurseries, Inc., 267 F.2d 286 (5th Cir., 1959), upon which the NLRB relies, the employees in question worked at the

---

2. The court said that the decisions in this circuit in Nix v. Farmers Mutual Exchange, 218 F.2d 642 (5th Cir., 1955) and Mitchell v. Georgia Broiler Supply, Inc.,

supra, were factually distinguishable and to the extent that Mitchell was not, declined to follow it.

company's warehouse in Huntsville, Alabama. The company had a large farm on which it grew nursery stock and a warehouse on this farm where that stock was also handled. To the employees in that warehouse, there was no question that the agricultural exemption applied. However, the stock handled at the downtown Huntsville warehouse by the employees in question was not grown on the company's own farm. Rather, the stock there was purchased from growers in ·Texas. These growers were not employees or agents of the company and although the company provided them with some advice, the court felt that this was not sufficient to warrant finding the company was the farmer and not simply the purchaser of the stock. Therefore, the Huntsville warehouse activities were not performed as incidental to or in conjunction with nursery growing activities, although the company in some of its other operations did perform such farming.

As in all the other cases cited ̦by the Board on this point, the distinction between those situations and the present one is that these birds belonged to the respondent and, although the raising of them was shared with independent growers, Strain's activities were more nearly that of one engaged in the "raising of * * * Poultry" than that of a purchaser, jobber, etc. Huntsville clearly did not grow the nursery stock in question; it bought it from independent growers. Similarly a company which owned no farms and grew no fruit did not engage in farming when the fruit it transported to market was purchased from others or left by fruit grove owners on the trees as unfit for packing. Chapman v. Durkin, 214 F.2d 360 (5th Cir., 1954); Fort Mason Fruit Co. v. Durkin, 214 F.2d 363 (5th Cir., 1954). Here, Strain raised the chickens. It did not buy them.

In summary, the Board's finding that the employees were not agricultural employees can only be sustained if respondent's arrangement with the independent growers is viewed as removing it from the primary definition of agriculture pertinent here, "the raising of poultry." Since we have concluded that this is not the case, there was no warrant in the record or a reasonable basis in law for the Board's conclusion that the employees were not "agricultural laborers within the meaning of Section 2(3) of the NLRA." Therefore, the employees would be exempt from coverage of the Act and enforcement of the Board's order must be denied.