**AGRICULTURAL TRANSPORTATION ASSOCIATION OF TEXAS**

v.

**UNITED STATES of America and Interstate Commerce Commission.**

**Civ. A. No. CA 4–746.**

United States District Court
N. D. Texas,
Fort Worth Division.

Oct. 24, 1967.

**530**

Richard T. Churchill, Fort Worth, Tex., for plaintiff, Agricultural Transportation Assn. of Texas.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Melvin M. Diggs, U. S. Atty., Fort Worth, Tex., for defendant, United States.

Jerome Nelson, Atty., Robert W. Ginnane, Gen. Counsel, Fritz R. Kahn, Assoc. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendant, Interstate Commerce Commission.

Ralph W. Pulley, Jr., Phinney, Hallman, Pulley & Livingstone, Hugh T. Matthews, Jr., Brooks, Montgomery & Matthews, Dallas, Tex., Harry J. Jordan, Washington, D. C., for intervening defendant, Motor Carriers, and others.

Ardell M. Young, Brown, Herman, Scott, Young & Dean, Fort Worth, Tex., James W. Nisbet and Ed White, Chicago, Ill., for intervening railroad defendants, The Atchison, Topeka, and Santa Fe Railway Co., and others.

Donald E. Graham, Atty., Office of Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., for intervening defendant, U. S. Dept. of Agriculture.

Before GOLDBERG, Circuit Judge, and BREWSTER and TAYLOR, District Judges.

WILLIAM M. TAYLOR, Jr., District Judge.

This is an action to set aside, restrain and enjoin an order of the Interstate Commerce Commission entered against Agricultural Transportation Association directing plaintiff to cease and desist from participating in the transportation of property in interstate commerce for compensation. The Commission's order was issued in accordance with a finding by a hearing examiner that plaintiff was not a "cooperative association", as defined by the Agricultural Marketing Act of 1929, as amended, Title 12 U.S.C.A. §§ 1141 and 1141j, and was not entitled to the cooperative association exemption from the requirements of the Interstate Commerce Act, § 203(b) (5), Title 49 U.S.C.A. § 303(b) (5).[1] We affirm the Commission's Order.

---

1. 49 U.S.C.A. § 303(b) :
Nothing in this chapter [49 U.S.C.A. §§ 301, et seq] * * * shall be construed to include * * * (5) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended, or by a federation of such cooperative associations, if such federation possess no greater powers than cooperative associations as defined; * * *
12 U.S.C.A. § 1141:
(a) It is declared to be the policy of Congress to promote the effective merchandising of agricultural commodities in interstate and foreign commerce so that the industry of agriculture will be placed on a basis of economic equality with other industries, and to that end to protect, control, and stabilize the currents of interstate and foreign commerce in the marketing of agricultural commodities and their food products—
* * *
(3) by encouraging the organization of producers into effective associations or corporations under their own control for greater unity of effort in marketing and by promoting the establishment and financing of a farm marketing system of producer-owned and producer-controlled cooperative associations and other agencies.
12 U.S.C.A. § 1141j:
(a) As used in this subchapter, the term "cooperative association" means any association in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged, and also

In January, 1963, the Interstate Commerce Commission, on its own motion, commenced an investigation of Agricultural Transportation, hereafter referred to as "ATA", to determine whether ATA was performing transportation of property in interstate commerce "for and on behalf of Iowa Beef Packers, Inc., City Packing Company, Estes Packing Company, Pet Milk Company, Neuhoff Bros. Packers, Inc., Melton Provision Co., Inc., Libby, McNeill & Libby, Topco Associates, Inc., and Safeway Stores, Inc., and [whether] the said companies have been and are now participating in * * * violations of [§§ 206(a) and 209(a) of the Interstate Commerce Act]." Between June, 1963 and July, 1963, hearings were conducted by an examiner in Dallas, Texas, and San Francisco, California. In his report of December, 1963, the examiner concluded that ATA, acting in concert with the above respondents, had engaged in interstate transportation of commodities for compensation. A cease and desist order was entered against ATA by Division I of the Commission. That same Division, acting in an appellate capacity, denied plaintiff's petition for reconsideration and motion for further oral hearings in March, 1965. In April, 1965, the Commission acknowledged that an issue of General Transportation Importance was existent in the ATA investigation and agreed to entertain plaintiff's application for reconsideration. The Commission, sitting en banc, denied the application in August of 1966, and this lawsuit followed.

ATA was organized and incorporated in February, 1962, under the Cooperative Marketing Act and the general corporation laws of the State of Texas [2] as a non-profit, no-capital corporation for the mutual benefit of its members. Its principal place of business is in Fort Worth, Texas.

A total of 51 members participate in the association (see attached appendix). In servicing these members ATA transports fresh beef and pork, frozen boxed meat, livestock, fresh fruits and vegetables, frozen fruit and vegetables, frozen citrus concentrates, canned goods, table products, desserts, margarine and shortening, frozen pies and waffles, and other processed or manufactured products to and through 12 states and Mexico. Transportation is also provided for nonmembers. ATA receives compensation for all carriage services it performs, from members and nonmembers alike. From the revenues so acquired ATA pays the salaries of its 16 administrative personnel and its 144 truck drivers, rents its 67 refrigerated trailer-trucks, and satisfies its other business expenses. ATA has distributed deferred patronage refund certificates, representing $25,000 in surplus revenues, to its members and nonmembers on a pro rata basis.

Plaintiff's principal contention in this court is that the Commission's conclusion

---

means any association in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services: *Provided, however*, That such associations are operated for the mutual benefit of the members thereof as such producers or purchasers and conform to one or both of the following requirements:

First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein; and

Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

And in any case to the following:

Third. That the association shall not deal in farm products, farm supplies, and farm business services with or for nonmembers in an amount greater in value than the total amount of such business transacted by it with or for members. All business transacted by any cooperative association for or on behalf of the United States or any agency or instrumentality thereof shall be disregarded in determining the volume of member and nonmember business transacted by such association.

2.  Articles 5737 et seq., Vernon's Annotated Civil Statutes.

that it was violating the Agricultural Marketing Act, 12 U.S.C.A. § 1141j, was predicated upon arbitrary fact finding and erroneous application of the law in determining that ATA received a greater percentage of its revenue from nonmembers than it did from members.

The third proviso of § 1141j(a) is a clear-cut expression of the legislative intent. To qualify as a cooperative under the Act,

"the association shall not deal in farm products, farm supplies, and farm business services with or for nonmembers in an amount greater in value than the total amount of such business transacted by it with or for members. * * *"

ATA is engaged in transporting the raw materials of its members to the processing plant and in transporting the processed product to the wholesale and retail outlets. The hearing examiner found that of these processed materials, actual farming activities by ATA members accounted for from 1% to 95% of the total, the precise percentage varying from member to member. The remaining portion of each member's total processed products was found to be attributable to the respective member's purchase contracts with outside nonmember parties. This situation was found to be most prevalent among the 22 members who were packers or fabricators of meat products. Most of these concerns had contracted with other motor carriers for the transportation of their outside purchases to the processing plants. Once processed, ATA would undertake the commingled transportation of these products and those it had carried to process.

The hearing examiner concluded that 66% of the processed goods transported by ATA in interstate commerce as member shipments were composed of raw

materials purchased by members from nonmembers. Applying this percentage to the revenue figures for the period under investigation, the examiner subtracted 66% of the $1,340,342 member-derived compensation and added that figure to the $1,190,011 nonmember-derived compensation.[3] This put nonmember income substantially in excess of member income. The examiner therefore recommended that a cease and desist order be entered.

Division I of the Commission discarded the examiner's use of the 66% figure, recognizing that it represented the averaging of unweighted percentages and hence was statistically invalid. The Commission obtained the same result as the examiner, however, by applying a "functionally related" standard. It found that the raw materials which the meat oriented members purchased from outside sources were not functionally related to those members' feedlots and farm activities. Division I stated,

"Where a food processor as part of his processing operation, commingles agricultural commodities produced on his own farm or feedlot with those purchased elsewhere, such commodities lose any identifiable relationship to the processor's operations and must be treated as nonmember business, and transportation provided therein cannot be considered a farm business service."

The *total* revenue from the 22 meat packers-fabricators was therefore treated as nonmember revenue.

As to the association members who engaged in *no* farming activities, but which purchased farm products under contract with outside producers, the division held that "actual ownership or operation of farms is a prerequisite to qualify an individual organization as a farmer."

3. The period for which these figures are representative is February 19, 1962 to May 31, 1963, covering a considerable length of time after the Commission instigated its investigation. Two other periods of time were surveyed by the Commission but were not independently considered in arriving at ATA's disqualification as a cooperative association. June,

July and August, 1962: member revenue $203,065; non-member revenue $188,506; and February 19, 1962 to January 31, 1963: member revenue $768,139; nonmember revenue $836,147. The survey considered by the Commission covers the longest period of time and is inclusive of the other 2 surveys.

The effect of the application of these 2 standards to the 47 members of ATA served to disqualify 36 of them and to render the transportation fees they paid ATA nonmember revenues, resulting in an excess of nonmember revenue over member revenue.

We need only concern ourselves with the effect on ATA's status as an exempt association worked by the dismembering by Division I of those firms charged by the Commission as accomplices to ATA in the interstate violations. The revenues derived by ATA from Neuhoff Bros., City Packing Co., Iowa Beef Packers, Estes Packing Co., Pet Milk, Melton Provision Co., Topco Associates, and Libby, McNeill & Libby from February 19, 1962 to May 30, 1963 total $529,769.06.[4]

As a result of reducing ATA's $1,-340,342 member revenue by this figure and increasing its nonmember revenue by that same figure, a substantial violation of Section 1141j(a) is shown (nonmember revenue $1,719,780.06 and member revenue $810,572.94).

The entire Commission, on plaintiff's motion for reconsideration, reached the same result as the examiner and the division, but on yet a different theory. The Commission discarded the division's rationale that member materials, when commingled with purchases from outsiders, became nonmember products and substituted a "pro-rated" standard, stating,

"Where the two classes of traffic cannot be identified or separated, the revenues derived must be pro-rated and considered as resulting from member business to the extent that the transportation of the member's prod-

ucts are proportionately related to his farming activities."

The Commission restricted this rule, however, only to the transportation of raw materials to the processing plant. As to those items which have been processed, as well as commingled with member and nonmember materials, the Commission held:

"A member who is both a farmer and a processor cannot fairly rely upon an exemption for a 'farmers' cooperative association * * * Thus, we hold that when the items have been so extensively commingled and processed as to lose their identity as farm products, then as to those items, the member is no longer a farmer and their transportation is no longer a 'farm business service.'"

The Commission rejected the division's conclusion that those members who do not engage in farming, but who contract and supervise for the production of raw materials are not farmers, as to the fruit and vegetable oriented members, but adopted this same conclusion as to the ATA members who do not raise cattle but who contract for the purchase thereof. Based on this theory, the Commission singled out 7 members who purchased cattle under contract and disqualified the $230,000 in revenues ATA acquired from them and credited as member revenue.[5] The subtraction of this figure from the member revenue column and its addition to the nonmember figure leaves ATA some $460,000 shy of qualifying as an exempt cooperative.

Additionally, the Commission found that the commodities ATA shipped for Safeway Stores, Inc., its largest nonmem-

4. Neuhoff Bros., $88,187.79; City Packing Co., $23,731.46; Iowa Beef Packers, $91,273.98; Estes Packing Co., $46,982.-89; Pet Milk, $41,931.41; Melton Provision Co., $27,113.01; Topco Associates, $465.50; and Libby, McNeill & Libby, $209,983.02. These figures are compiled from the Service Bureau Corporation revenue analysis of ATA for periods of February 19, 1962 to August 31, 1962, and September 1, 1962 to May 31, 1963.

5. City Packing Company and Estes Packing Company were the only two respondents cited by the Commission within this group. Others were Dallas City Packing Company, Dirr's Gold Seal Meats, Modern Meat Packing Company, Monfort Packing Company, and Union Packing Company.

ber supplier, were not "reasonably incidental" to farm activities which are conducted to the mutual benefit of its members. Safeway revenues were in excess of $500,000 for the time period in question. This conclusion is tantamount to a finding that ATA is engaged in outright interstate commerce activity.

Plaintiff, in addition to complaining of the rather fickle nature of the legal rationales applied at the three levels of Commission adjudication, proposes what it contends to be the correct standard in determining what is member and non-member revenue. ATA's theory, as we understand it, is that member revenue derives from the transportation of processed commodities which are composed of raw ingredients purchased from outsiders, which cannot be traced to their source, provided that the outside raw materials do not produce a revenue figure which exceeds that yielded by the raw material components produced by the member's own crops or livestock.

That ATA was violating the provisions of § 203(b) (5) of the Interstate Commerce Act and § 1141j of the Cooperative Marketing Act poses no problem to us. ATA does not have a certificate of public convenience and necessity. 49 U.S. C.A. § 301 et seq. The propriety of its interstate activity is predicated solely on the fact that it is a cooperative association exempt from regulation by the ICC.

■ Under § 1141j, ATA is permitted to engage in transportation for nonmembers to an extent that the revenues therefrom do not exceed the revenues yielded from the member associations. But this provision does not give a cooperative association carte blanche authority to engage in interstate transportation of *any* commodities for nonmembers within the prescribed limits. The products transported for nonmembers must be *incidental* to the primary farm service of the association and *necessary* in the sense that the carriage service must be rendered so as to equalize or prevent an economic loss which would result from a trip with an empty trailer-truck. Northwest Agricultural Cooperative Association v. Interstate Commerce Commission, 9 Cir., 1965, 350 F.2d 252. Although ATA has 13 members in California, the evidence reflects that its transportation for Safeway, a Los Angeles, California firm, was not conducted incidental or necessary to its California member business. Indeed, ATA was shipping goods to Los Angeles from Safeway's Texas producers and then conducting return trips to Colorado, Oklahoma and Texas solely for Safeway's benefit. As a result of this service, Safeway evolved as the largest user of ATA's services. This fact does not however singularly expose the unlawful nature of the ATA-Safeway arrangement. To be sure, ATA could have been engaging in a constant flow of member traffic to or from the West Coast and servicing Safeway in the opposite direction on its return trips. But the disproportion between Safeway trips and member trips in the reverse direction forcefully bespeaks of ATA's outright interstate service to Safeway.

■ Turning to the member-respondents which the Commission excluded as contributing to member revenue, we begin our discussion by defining a "farmer", as used in § 1141j, in terms consistent with the spirit of the Agricultural Marketing Act. As expressed in § 1141, the policy of the Act is "to promote the effective merchandising of agricultural commodities * * * so that the industry of agriculture will be placed on a basis of economic *equality with other industries* * * * by encouraging the organization of *producers* into effective associations * * * for greater unity of effort in *marketing* * * *." The thrust of this policy is to promote the economic status of *producer marketing* to a point at which its interstate mobility is equal with that of other industries. Without the scope of "producer marketing" and within the purview of "other industries" are the *processors* of farm produced materials. This is evident from a reading of § 1141j(a) wherein Congress authorized the cooperative association, composed of producers, to act together in *processing* and *distributing*

their produce, while the processing and distributing *industries* were excluded from the declaration of policy in § 1141. We hold, therefore, that a "farmer" within the Agricultural Marketing Act is a producer of agricultural commodities.

■ The question immediately arises as to the extent to which the producer must be engaged in agricultural production to qualify as a farmer. The third proviso of § 1141j(a) provides that a cooperative association may engage in farm business services for persons or companies who do not qualify as farmer-members to an extent not to exceed the services it performs for members. We believe the same standard by which the qualification of the collective group is determined controls the qualification of the individual components of that group. A producer of agricultural commodities is deemed a farmer within the Act if the raw materials which he himself produces for marketing are not exceeded in volume or quantity by the raw materials he purchases for marketing from an outside source. The true producer will consistently remain above the danger line. However, to the extent that a bona fide producer ships more to market which he has purchased than he has produced, the Commission may apply whatever standard it deems, in its expertise, appropriate in determining if in fact the producer is primarily engaged in agricultural productivity.

■ It follows that those companies which are producer-processor oriented are entitled to farmer status within a cooperative association up to such point as their raw-production materials reach the processing plant. Likewise, they are subject to the foregoing rule that their purchased raw materials can not exceed in quantity their self-produced raw materials.

■ Nothing we have herein said is to be construed so as to prohibit members of a cooperative association from organizing, managing and controlling their own processing and distributing facilities. So long as such activities remain a cooperative effort by the members for their mutual benefit, the association is given specific statutory authority to undertake such a pursuit. § 1141j(a), 12 U.S.C.A.

■ In determining whether the revenue deriving from the transporting of the commodities of the aforedefined farmer members is to be treated as member or nonmember compensation, we hold as follows: first, if the revenue in question is attributable to raw materials, 50% or more of which were produced by the member itself, then the total compensation paid by the member for the transportation of the raw materials is to be treated as member revenue. Thus, if a member shipped 100 head of cattle which it raised on its own feedlots and 50 head purchased from an outside source, the total compensation paid is member revenue. Secondly, if the shipper is carried on the association's books as a member, but in a given shipment, or in shipments over a given period of time, more than 50% of the raw materials are attributable to purchases from outside sources, then that percentage so attributed is nonmember income. The remainder is member income.

These expressions, we believe, are healthy interpretations of the congressional intent to bolster the marketing ability of the agricultural producers. We do not deem these rules as encroachments on the province of the Commission. The first pronouncement permits the association to treat as member revenue the compensation paid it by a member which is bona fide farm-oriented, but which exceeds its own production capacity or volume by purchasing additional raw materials to send to market. The member's association should not be forced to suffer loss of its exemption because the member can, through outside purchases, satisfy a marketing need greater than his ability to produce. Secondly, the association should not be put upon to classify as nonmember the revenue deriving from a shipper which it carries as a member merely because in a given shipment or over a given period of time

a greater percentage of material shipped by the shipper is purchased from an outsider. If a producer qualifies as a farmer as determined by his production capacities neither he nor the association should suffer disqualification of his entire shipment or shipments. By classifying as nonmember only the revenue attributed to nonmembers' purchases, the association is permitted to give effect to the bona fide substance of the member's production capabilities.[6]

■ We take note of one important exception to the foregoing rules excluding those shippers who do not engage in agricultural production. The processor contracting with small farmers for the production of raw materials which furnishes seed and fertilizer, supplies financing, closely supervises the actual growing of crops or raising of cattle, assumes the risk of loss, and which is the legal owner of the crop or head of cattle, is entitled to qualify as a farmer until the processing stage is reached. We distinguish this processor from the one which contracts merely to get a "price". The latter is little more than a promoter.

■ The revenues which ATA accrued from the named respondents do not under our foregoing expressions fall within the classification of member compensation. Estes Packing Company conducts no farming. It is a processor affiliated with independent cattle raisers. City Packing Company does not own farms or feedlots. It is principally a processor which obtains its cattle from affiliated corporations and commercial feedlots. Iowa Beef Packers raise 1.5% of the cattle from which they obtain their meat. Neuhoff Bros. produces 26% of the cattle from which it processes its meats. Melton Provision Company raises only 20% of its beef, but ATA's principal service to Melton is transportation of mutton derived from sheep which are kept on Melton's lots for only 60 days. ATA has transported only processed commodities for farmer-processors, Pet Milk and Libby, McNeill & Libby. Topco Associates is a cooperative wholesale food distributor whose members are food retailers. ATA transports only processed commodities for Topco.

The record is abundantly clear that numerous other members of ATA are engaged in activities with ATA which are violative of the Interstate Commerce Act. As these members were not, however, cited by the Commission as respondents, we make no effort to pass on their activities.

■ Plaintiff's other contention is that the Commission erred in failing to grant it a rehearing at which time ATA would have presented the following evidence of change in its status: (1) patronage refunds and credits in excess of $50,000 for the benefit of some 450 patrons; (2) the ending of patronage refunds to nonmembers; (3) the termination of 7 memberships including respondents, City Packing, Melton Provision, and Libby, McNeill; (4) the addition of 12 new cooperative members and 11 new individual members; (5) the ownership of feedlots and farms by Estes Packing which provide most of this shipper's cattle needs; and (6) the inception of farming and cattle raising by Cobb and the disposal of his interests in the trucks and trailers he leased to ATA.[7]

While the reform which ATA's offer of evidence would indicate is to be appreciated, we likewise entertain appre-

---

6. In so deciding, we presume that a bona fide producer's outside purchases will not, in the long run, outweigh his own production. Of course, should such a member's outside purchases consistently account for a greater percentage of his overall shipping business, the Commission is in a position to take appropriate action.

7. The Commission made much ado of the fact that Cobb and the 6 directors of

ATA did not personally engage in farming and used this finding of fact to support its conclusion that ATA was not an exempt cooperative because, for this reason, it was not "controlled by farmers." This rationale we do not find persuasive in disqualifying ATA. Each of the cooperative's 51 members has voting power in determining the management of its business activities. This is all that is required. 12 U.S.C.A. § 1141j(a).

ciation for an end to litigation in the administrative process. The Commission correctly stated the law in declining ATA's motion for rehearing when it quoted from Interstate Commerce Commission v. Jersey City, 1944, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420, 1428, thusly:

> One of the grounds of resistance to administrative orders throughout federal experience with the administrative process has been the claims of private litigants to be entitled to rehearings to bring the record up to date and meanwhile to stall the enforcement of the administrative order. Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

Under any other rule, an organization claiming exemption as a cooperative could perpetually avoid regulation by continual alterations in memberships, organization or traffic.

Moreover, we do not read the Commission's order as putting ATA out of business. Cessation of nonmember activity in interstate commerce is the essence of the Commission's order. Indeed, it is quite obvious from the record that a considerable volume of ATA's business is transacted well within the limits of the Interstate Commerce and Agricultural Marketing Acts. The principal vice of ATA member transportation is the car-

rying of processed goods. The abrogation of this practice together with that of the nonmember service rendered to Safeway, will bring ATA's activities well within the requirements of the cooperative marketing association exemption. A true cooperative association, existing for the mutual benefit of its members, need not be dependent for its sustenance upon the activities in which ATA has been engaged. If plaintiff cannot cease such activities without suffering a severe loss of operating ability, the time is ripe for it to obtain a certificate of public convenience and necessity.

The order of the Interstate Commerce Commission is affirmed.

### APPENDIX "A"

Adipose, Inc.,
Woodland, Calif.

Deward Armstrong,
Hereford, Tex.

Harvey Brock,
Hereford, Tex.

Albany Frozen Foods, Inc.,
Albany, Oregon

Centralia Fruit Farms & Nursery,
Centralia, Wash.

Bookey Packing Company,
Des Moines, Iowa.

City Packing Company,
Fort Worth, Texas.

Dallas City Packing Co.,
Dallas, Texas

Dirr's Gold Seal Meats, Inc.,
Miami, Fla.

Durham Meat Co. of Mt. View,
Mountain View, Calif.

Excel Packing Co., Inc.
Wichita, Kansas

Glacier Packing Company,
Sanger, California

Ideal Packing Company,
Los Angeles, California

Iowa Beef Packers, Inc.
Denison, Iowa.

Kain Cattle Company,
Lubbock, Texas.

Love & Sons Potato Co.,
LaSalle, Colo.

Mariani Frozen Foods,
Santa Clara, Calif.

Melton Provision Company,
San Antonio, Tex.

Monfort Packing Company,
Greeley, Colo.

Neuhoff Brothers Packers,
Dallas, Tex.

Orinda Olive Corporation,
Orinda, California

Earl Cogburn & Sons,
Gilcrest, Colorado.

William B. Davis Live Stock,
Scottsdale, Arizona.

Fred Dold & Sons Packing Co.,
Wichita, Kansas

Estes Packing Company,
Fort Worth, Texas.

E. D. Fenner,
Haslet, Tex.

Houston Packing Company,
Houston, Texas

Industrial Coahuilla, S. A.,
Piedras Negras, Coachuilla, Mex.

Iowa Pork Company, Inc.
Perry, Iowa

Libby, McNeill & Libby,
Chicago, Illinois

Manteca Frozen Foods,
Manteca, Calif.

Marks Meat Company, Inc.,
Woodland, Calif.

Modern Meat Packing Company,
Norwalk, Calif.

Naturipe Berry Growers,
San Jose, Calif.

Ore-Ida Foods, Inc.,
Ontario, Oregon.

Oxnard Frozen Foods,
Oxnard, Calif.

Pet Milk Company,
St. Louis, Missouri.

Smith Frozen Foods,
Melton-Freewater, Oregon

Union Packing Company,
Vernon, Calif.

Ventura Costal Lemon Co.,
Ventura, California

Western California Canners, Inc.
Antioch, Calif.

Wilderspin Cattle Company,
Fort Worth, Texas.

Peyton Packing Company,
El Paso, Texas.

Sunset Packing Co. of Oregon,
Banks, Oregon

United Pacific Packers, Inc.
Seattle, Washington

Ventura Processors,
Ventura, California.

Western Idaho Potato, Inc.,
Nampa, Idaho

Rosenthal Packing Company,
Fort Worth, Texas.

Topco Associates, Inc.,
Skokie, Illinois

Standard Meat Company,
Fort Worth, Texas.

Samuels E–Tex Packing Company,
Mt. Pleasant, Texas.