**UNITED STATES of America, Plaintiff-Appellant,**

v.

**NATIONAL BROILER MARKETING ASSOCIATION, Defendant-Appellee.**

No. 76–2115.

United States Court of Appeals, Fifth Circuit.

April 22, 1977.

---

Barry Grossman, John J. Powers, III, Thomas E. Kauper, Asst. Attys. Gen., Antitrust Div., U. S. Dept. of Justice, Washington, D.C., John W. Stokes, U. S. Atty., Atlanta, Ga., for plaintiff-appellant.

Joel B. Kleinman, Washington, D.C., amicus curiae, for Alabama, and others.

Sidney O. Smith, Michael A. Doyle, Frederick H. Von Unwerth, Atlanta, Ga., for defendant-appellee.

Before MORGAN and HILL, Circuit Judges, and NOEL,* District Judge.

LEWIS R. MORGAN, Circuit Judge:

We must decide whether broiler industry companies that neither own nor operate farms can be "farmers" within the meaning of a 1922 federal statute called the Capper-Volstead Act,[1] which gives farmers' cooperatives some measure of protection from the antitrust laws. The question is a novel one. After careful study of the Act and its legislative history, we are convinced that Congress's purpose in enacting Capper-Volstead does not mandate or permit protection of these broiler industry companies from the proscriptions of the antitrust laws. The

---

* Senior District Judge of the Southern District of Texas sitting by designation.

1. 7 U.S.C. §§ 291–92.

district court held otherwise, and we reverse.

## I. FACTS

### A. *The Broiler Industry*

Broilers are young chickens that are slaughtered when seven-to-nine weeks old, then processed and offered for sale ready-to-cook. The broiler industry comprises generally two types of entities—integrator companies and contract growers. The defendant National Broiler Marketing Association (NBMA) is composed of integrator companies.

"Integrators" have that name because over the years they have accomplished what is called the vertical integration of much of the broiler industry. That is, they have taken on more than one of the tasks necessary to bring broilers to consumers. Thus, many NBMA members[2] own and operate not only processing plants, but also feed mills, hatcheries, and breeder flocks (for the production of broiler eggs). Still, most NBMA members are processors, and a few operate only processing plants.

The one major operation not generally performed by the integrator firms is the actual raising of the broiler chicks to maturity. This is handled by farmers called contract growers. These growers raise the chicks on their own farms in their own buildings. They provide their own labor and equipment. The growers also supply the water and electricity needed during the grow-out process, as well as the litter and fuel used in lining and heating the broiler houses. The day-to-day husbandry of the flocks is left to the growers.

Title to the broiler chicks is retained by the broiler integrators during the grow-out process. The integrators also supply feed and veterinary services. The integrators decide the number and timing of chick placements and the age and size at which the birds will be marketed.

Generally, the growers are treated by the integrators as independent contractors. The contracts provide for a minimum and maximum payment per bird or per pound to the grower.[3]

### B. *The Litigation*

The government brought a civil antitrust action[4] against NBMA, alleging that the Association's members and others had combined to fix broiler prices and to restrict broiler production in order to increase broiler prices. After a period of discovery, both parties moved for partial summary judgment on agreed facts. The issue was whether NBMA's members are farmers within the meaning of the Capper-Volstead Act, which states generally that "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers" may engage in certain activities cooperatively.[5]

■ The district court held that NBMA's members are farmers as the term is used in

---

**2.** This also includes companies owned by NBMA members or companies commonly owned with NBMA members.

**3.** The minimum payment provided in some contracts is less than the cost incurred by the average grower in raising a flock of broilers. Ordinarily, NBMA members are free to lower the payment scale under their contracts with growers before any new flock is grown in response to rising feed costs or falling market prices for broilers. Members are also free to reduce the number of broilers or flocks placed with growers in response to market conditions. Members are usually free to terminate their contracts with growers after any flock and in fact have done so for a variety of reasons.

**4.** The action was brought under section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain alleged violations of section 1 of that Act, 15 U.S.C. § 1.

**5.** The full text of the Act is as follows:

§ 291. Authorization of associations; powers

Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such association may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however,* That

the Act and granted NBMA's motion for partial summary judgment.[6] Then the government, with NBMA's acquiescence, filed an amended complaint, deleting all of

such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

And in any case to the following:

Third. That the association shall not deal in the products of non-members to an amount greater in value than such as are handled by it for members.

§ 292. *Monopolizing or restraining trade and unduly enhancing prices prohibited; remedy and procedure*

If the Secretary of Agriculture shall have reason to believe that any such association monopolizes or restrains trade in interstate or foreign commerce to such an extent that the price of any agricultural product is unduly enhanced by reason thereof, he shall serve upon such association a complaint stating his charge in that respect, to which complaint shall be attached, or contained therein, a notice of hearing, specifying a day and place not less than thirty days after the service thereof, requiring the association to show cause why an order should not be made directing it to cease and desist from monopolization or restraint of trade. An association so complained of may at the time and place so fixed show cause why such order should not be entered. The evidence given on such a hearing shall be taken under such rules and regulations as the Secretary of Agriculture may prescribe, reduced to writing, and made a part of the record therein. If upon such hearing the Secretary of Agriculture shall be of the opinion that such association monopolizes or restrains trade in interstate or foreign commerce to such an extent that the price of any agricultural product is unduly enhanced thereby, he shall issue and cause to be served upon the association an order reciting the facts found by him, directing such association to cease and desist from monopolization or restraint of trade. On the request of such association or if such association fails or neglects for thirty days to obey such order, the Secretary of Agriculture shall file in the district court in the judicial district in which such association has its principal place of business a certified copy of the order and of all the records in the proceeding, together with a petition asking that the order be enforced, and shall give notice to the Attorney General and to said association of such filing. Such district court shall thereupon have jurisdiction to enter a decree affirming, modifying, or setting aside said order, or enter such other decree as the court may deem equitable, and may make rules as to pleadings and proceedings to be had in considering such order. The place of trial may, for cause or by consent of parties, be changed as in other causes.

The facts found by the Secretary of Agriculture and recited or set forth in said order shall be prima facie evidence of such facts, but either party may adduce additional evidence. The Department of Justice shall have charge of the enforcement of such order. After the order is so filed in such district court and while pending for review therein the court may issue a temporary writ of injunction forbidding such association from violating such order or any part thereof. The court may, upon conclusion of its hearing, enforce its decree by a permanent injunction or other appropriate remedy. Service of such complaint and of all notices may be made upon such association by service upon any officer or agent thereof engaged in carrying on its business, or on any attorney authorized to appear in such proceeding for such association, and such service shall be binding upon such association, the officers, and members thereof.

7 U.S.C. §§ 291–92.

Eight years prior to passage of the Capper-Volstead Act, Congress enacted section 6 of the Clayton Act, 15 U.S.C. § 17:

§ 17. *Antitrust laws not applicable to labor organizations*

The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

This was the first Congressional action to protect cooperative endeavors from the antitrust laws. Capper-Volstead's effect was "to clarify the exemption for agricultural organizations and to extend it to cooperatives having capital stock." *Case-Swayne Co. v. Sunkist Growers, Inc.,* 389 U.S. 384, 391, 88 S.Ct. 528, 532, 19 L.Ed.2d 621 (1967).

6. *United States v. National Broiler Marketing Ass'n,* 1975–2 CCH Trade Cases ¶ 60, 509 (N.D.Ga. Aug. 26, 1975).

the allegations that survived the partial summary judgment.[7] The parties stipulated that the government would be allowed to bring a later action reviving those allegations.

The district court granted final judgment in favor of NBMA,[8] and the case is here on the government's appeal of the district court's final order.

## II. DISCUSSION

We have noted already that the issue we must decide today is novel. In fact, the Capper-Volstead Act, since its enactment in 1922, has received little attention from the Supreme Court.[9] Moreover, no significant body of Capper-Volstead law has developed in the lower federal courts.[10] And the legal commentary has not been abundant.[11]

7. Even cooperatives that come within the protection of Capper-Volstead do not thereby obtain complete antitrust immunity. *See Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); *United States v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

8. *United States v. National Broiler Marketing Ass'n*, 1976–1 CCH Trade Cases ¶ 60, 801 (N.D.Ga. Mar. 16, 1976).

9. The Supreme Court's most recent decision interpreting Capper-Volstead is *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967), in which the Court held that the Sunkist cooperative could not qualify for the exemption because some of its members were packing houses that contracted with fruit growers to handle the growers' fruit for cost plus a fixed fee. 389 U.S. at 387, 88 S.Ct. 528. The Supreme Court in *Case-Swayne* emphasized that the legislative history of Capper-Volstead made clear Congress's purpose to limit the shelter of the Act to actual growers. *Id.* at 391–93, 88 S.Ct. 528. Thus, the Court concluded that "Congress did not intend to allow an organization with such nonproducer interests [*i. e.*, the packing houses] to avail itself of the Capper-Volstead exemption." *Id.* at 395–96, 88 S.Ct. at 535.
The instant case is a logical successor to *Case-Swayne*. In *Case-Swayne*, the Supreme Court had little difficulty concluding that the packing houses were not farmers. Here, entities somewhat analogous to the packing houses, broiler integrators, assert that they are farmers for the reasons stated in the text *infra*.
The remaining Supreme Court decisions about Capper-Volstead are *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962) (several cooperatives may join together as one organization without losing Capper-Volstead protection); *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960) (Capper-Volstead not a license for farmers' cooperatives to engage in predatory practices otherwise violative of section 2 of Sherman Act); and *United States v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939) (cooperative's combi-

nation with nonproducers not protected by Capper-Volstead; Capper-Volstead section 2 not exclusive remedy for cooperatives' anticompetitive conduct).
*See also Tigner v. Texas*, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124 (1940) (state antitrust law that exempts agriculture enterprises does not violate federal Constitution); *Frost v. Corporation Commission*, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929) (Brandeis, J., dissenting) (discussion of cooperative movement); *Liberty Warehouse Co. v. Burley Tobacco Growers' Co-operative Marketing Ass'n*, 276 U.S. 71, 48 S.Ct. 291, 72 L.Ed. 473 (1928) (statute making illegal the witting interference with contract between farmer and cooperative not violative of federal Constitution).

10. The court of appeals and district court decisions treating Capper-Volstead either reached the Supreme Court, *see* note 9 *supra*, or are fairly routine applications of the principles announced in the Supreme Court opinions, *e. g., Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976) (applying *Borden* and *Maryland & Virginia Milk Producers*); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974) (potato marketing associations' activities qualified as marketing within meaning of Capper-Volstead); *North Texas Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189 (5th Cir. 1965), *cert. denied*, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966) (applying *Maryland & Virginia Milk Producers*); *Northern California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative*, 413 F.Supp. 984 (N.D.Cal.1976) (Capper-Volstead protects price-fixing by cooperative even when not incident to other collective activity); *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 355 F.Supp. 408 (D.C.Cal.1971) (restructured Sunkist comes within Capper-Volstead).

11. *See generally, e. g.*, J. von Kalinowski, 16F Business Organizations (Antitrust Laws &

The positions of the parties may be stated briefly. The government contends that Congress clearly meant to limit the benefits of the Capper-Volstead Act to persons that own or operate farms. The government argues that this interpretation comports with the ordinary meaning of the word "farmers" and with the central themes of the legislative history of the Act. The record reflects and NBMA concedes that some of its members neither own nor operate any farms on which broilers are raised to maturity.

NBMA counters that "farmers" ought to. be read "in a realistically broad sense."[12] Deemphasizing "farmers," but clearly aware that the term "farmers" is the slipper that must fit the foot, NBMA argues that Congress intended to afford Capper-Volstead's protection "to all persons actually engaged in the production of agricultural products."[13] NBMA urges that its members are so engaged principally because they own the chicks, furnish the feed, and share in the risks that attend broiler production.

Neither of the interpretations seems on its face wholly irrational. Our task is to decide which of the two is the more congenial to the language and purpose of Capper-Volstead.

### A. The Words Congress Used

We begin with the words of the statute.[14] Congress granted a measure of protection from the antitrust laws to "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers . . . ." NBMA focuses on the first part of the clause—persons engaged in the production of agricultural products—as the key to the Act's coverage. It seems clear, however, that the universe of persons engaged in the production of agricultural products can be larger than the universe of those so engaged as farmers, planters, ranchmen, dairymen, nut or fruit growers.[15] The test,

---

Trade Regulation) §§ 51.01 to –.06 (1976); Hanna, *Antitrust Immunities of Cooperative Associations*, 13 Law & Contemp. Prob. 488 (1948); Hufstedler, *A Prediction: The Exemption Favoring Agricultural Cooperatives Will Be Reaffirmed*, 22 Admin.L.Rev. 455 (1969–70); Lemon, *The Capper-Volstead Act—Will It Ever Grow Up*, 22 Admin.L.Rev. 433 (1969–70); Mahaffie, *Cooperative Exemptions Under the Antitrust Laws: A Prosecutor's View*, 22 Admin. L.Rev. —— (1969–70); Mischler, *Agricultural Cooperative Law*, 30 Rocky Mtn.L.Rev. 381 (1958); Noakes, *Exemption for Cooperatives*, 19 ABA Antitrust Section 407 (1961); Pogue, *The Rationale of Exemptions from Antitrust*, 19 ABA Antitrust Section 313 (1961); Saunders, *The Status of Agricultural Cooperatives Under the Anti-Trust Laws*, 20 Fed.B.J. 35 (1960).

**12.** Brief for NBMA at 42. *But see Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967). In Case-Swayne, the Supreme Court characterized Capper-Volstead as constituting "special exceptions to a general legislative plan," *id.* at 393, 88 S.Ct. at 533 and further spoke of the Act as a "limited" exemption, *id.* at 391 n. 8, 88 S.Ct. 528.

**13.** Brief for NBMA at 22.

**14.** *Dupuy v. Dupuy*, 511 F.2d 641, 642 (5th Cir. 1975).

**15.** The legislative history of Capper-Volstead, discussed *infra*, shows a genuine Congressional concern that the statute not be as broad as a liberal construction of "production" might allow. In *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967), the Supreme Court noted this concern, quoting from a floor debate exchange involving Senator Kellogg, a principal sponsor of the measure:

> "Mr. CUMMINS. . . . Are the words 'as farmers, planters, ranchmen, dairymen, nut or fruit growers' used to exclude all others who may be engaged in the production of agricultural products, or are those words merely descriptive of the general subject?
>
> "Mr. KELLOGG. I think they are descriptive of the general subject. I think 'farmers' would have covered them all.
>
> "Mr. CUMMINS. I think the Senator does not exactly catch my point. Take the flouring mills of Minneapolis: They are engaged, in a broad sense, in the production of an agricultural product. The packers are engaged, in a broad sense, in the production of an agricultural product. The Senator does not intend by this bill to confer upon them the privileges which the bill grants, I assume?
>
> "Mr. KELLOGG. Certainly not; and I do not think a proper construction of the bill grants them any such privileges. The bill covers farmers, people who produce farm products of all kinds, and out of precaution the descriptive words were added.

then, is whether broiler integrator firms are *farmers.*

■ What meaning are we to place on the word "farmers"? It is long settled that words in statutes should be given their ordinary, popular meaning unless Congress clearly meant the words in some more technical sense.[16] Mr. Justice Frankfurter stated the point well:

> [L]egislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.

*Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944). Of course we cannot take a poll to determine the ordinary, popular meaning of the word "farmers." And our confidence in the dictionary for this purpose is not great.[17] We are left to our judgment, informed by the whole of our experience.

■ We cannot conceive that the ordinary, popular sense of the word "farmers" would fit broiler integrator companies. The husbandry of the broiler flocks is carried out neither by these firms nor by their employees, but by the contract growers. The farms where the husbandry is done are owned not by NBMA members or their employees, but by these growers. Whatever else farming may mean, an irreducible minimum must be either husbandry of animals or crops or farm ownership. Given the absence of both of these elements here, none of the factors suggested by NBMA as indicative of farming nor all of the factors together would seem a sufficient shoe horn to squeeze these companies into farmers' boots. Asked to examine the broiler business and to identify the "farmers," Justice Frankfurter's common run of men, we think, would point to the contract growers—the persons who own and operate the farms—as the "farmers."

■ NBMA cautions us against a romantic view of agriculture and points out that agriculture has changed greatly from the Jeffersonian conception of the self-sufficient yeoman. We agree that agriculture has changed much. But the ordinary, popular meaning of the word "farmer" has not. When the common run of people wish to speak of the broader spectrum of modern agriculture, the word generally used is "agribusiness." "Farmer" still means what it meant in 1922—one who owns or operates a farm.

Mr. Justice Holmes observed once that "the meaning of a sentence is to be felt rather than to be proved . . . ." *United States v. Johnson*, 221 U.S. 488, 496, 31 S.Ct. 627, 55 L.Ed. 823 (1911). We believe the Capper-Volstead Act, with its listing of beneficiaries—farmers, planters, ranchmen, dairymen, nut or fruit growers—has a feeling, a cadence of meaning, that has no place for NBMA's member companies.

## B. *The Legislative History*

Our examination of the legislative history of Capper-Volstead has only reinforced our conviction that Congress meant "farmers" to be read in its ordinary sense, as urged by the government, rather than in an imaginative, broad sense, as urged by NBMA.

■ The Act's legislative history carries two dominant themes. Congress meant to improve the bargaining position of farmers vis-a-vis corporate middlemen in order to increase farm income and, importantly, to

---

"Mr. TOWNSEND. They must be persons who produce these things.
  "Mr. KELLOGG. Yes; that has always been the understanding."
389 U.S. at 392, 88 S.Ct. at 533, *quoting* 62 Cong.Rec. 2052 (1922).

**16.** *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968); *Malat v. Riddell*, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966).

**17.** The relevant definitions of the word "farmer" in *Webster's Third New International Dictionary* (1964) include "a person who cultivates land or crops or raises livestock," "one that rents or leases land for cultivation," and "a person whose primary occupation is the raising of crops or livestock." *Id.* at 824.

stop the rise of tenancy and the migration of farm families to the cities. Second, Congress was convinced that the benefits afforded to farmers by Capper-Volstead should not be extended to include the corporate entities with which farmers dealt.

The Congressional concern for the weak bargaining position of the individual farmer was emphasized in the House Report:

> Whenever a farmer seeks to sell his products he meets in the market place the representatives of vast aggregations of organized capital that largely determine the price of his products. Personally he has very little if anything to say about the price. If he seeks to associate himself with his neighbors for the purpose of collectively negotiating for a fair price he is threatened with prosecution.[18]

This point was reiterated in the upper chamber's debates. Senator Kellogg, the floor manager of the legislation, spoke of the farmer as "a small holder of land" whose "means and . . . opportunities are not sufficient to allow him to take any steps whatever in placing his products with the ultimate consumer or, usually, with the middleman." [19] Thus, Congress's purpose in enacting Capper-Volstead was, as Mr. Justice Black observed, to give "individual farmers . . . through agricultural cooperatives acting as entities, the same unified competitive advantage—and responsibility—available to businessmen acting through corporations as entities." *Maryland & Virginia Milk Producers Association v. United States*, 362 U.S. 458, 466, 80 S.Ct. 847, 853, 4 L.Ed.2d 880 (1969).

NBMA suggests that the purpose of Capper-Volstead was to make farming reliably profitable and to assure the nation a stable supply of wholesome food. This characterization is incomplete and therefore misleading. Congress meant to make farming reliably profitable in order to insure the occupational survival of small scale agriculturalists who were "widely scattered and inured to habits of individualism . . . ." [20] By 1922 farming's unprofitability had sent thousands of farmers to the cities to find work.[21] Congress feared that the system of small, individually owned farms would be unable to survive. Senator Kellogg stated this apprehension during the floor debates: "In my opinion, the greatest concern confronting the statesmen of the country is the tendency to drift to the cities, the decline of agriculture, the increase of landlordism and tenancy." [22] Senator Capper reiterated the point:

> Mr. President, every statesman looks forward to a condition as ideal when the whole country will be dotted with small farms, each operated by its owner. Every statesman deplores the spread of ten-

---

18. H.R.Rep.No.24, 67th Cong., 1st Sess. 2 (1921).

19. 62 Cong.Rec. 2050 (1922).

20. The quoted language is from *Tigner v. Texas*, 310 U.S. 141, 145, 60 S.Ct. 879, 881, 84 L.Ed. 1124 (1940) (Frankfurter, J.).

21. *See* 62 Cong.Rec. 2218 (1922) (remarks of Sen. Calder).

22. 62 Cong.Rec. 2051 (1922).
    In the 1955 report of the Attorney General's National Committee to Study the Antitrust Laws, the chief reasons for protection of certain agricultural activities from the antitrust laws were listed. First among these was "preservation of the family farm as the primary unit of agricultural production." The report also listed assurance of an adequate supply of agricultural products and "the need for offsetting the weakness of the individual farmer faced with greater bargaining power in the markets where he buys and sells." J. von Kalinowski, 16F Business Organizations (Antitrust Laws and Trade Regulation § 51.01[1], at 51–3 n. 3 (1976),
    *quoting* Att'y Gen.Rep. 306 (1955).
    During the last decade of the 19th century and the early decades of the 20th, mortgage indebtedness rose sharply, and there was a dramatic growth in the amount of farm tenancy in the country. By the end of the 1920s, a large percentage of the nation's farmers no longer owned the land they worked. Tenancy rates were exceptionally high in the specialized cash-crop areas of the country. In the eastern and western Cotton Belts, over two-thirds of all farmers were tenants, and in the wheat and corn belts, approximately two-fifths farmed land they did not own.
    Conrat & Conrat, How U.S. Farmers Became Specialists—in Cash and Debts, *Smithsonian* 54 (Mar. 1977).

antry and insists that best citizenship can be developed only upon the individual system of farm production. Because of this peculiar characteristic of agriculture, the growers have never been able to adopt a corporate form of organization; they have, therefore, gradually fitted into the cooperative form of organization, which maintains individuality of production but enables them to unite for marketing purposes.[23]

Cooperation among farmers thus was seen as the best solution to the farmers' problems because it allowed them to band together without sacrificing their social and economic individualism. The House Report, for example, rejected the corporate mechanism as the farmers' redemption:

> It is no answer that farmers may acquire the status and secure the rights of a business corporation by deeding their farms to a corporation. That is neither practical nor desirable from any standpoint.[24]

Senator Kellogg agreed:

> Mr. President, of course, the farmer can not consolidate his land into great holdings or into corporate ownership, and he should not do so. The hope of this Nation, the hope of any nation, the hope of the independence and the prosperity of our people, our very civilization, depends upon the individual ownership and proprietorship of the soil.[25]

A corollary to Congress's purpose to strengthen the position of farmers vis-a-vis middlemen was Congress's resolve to leave fully subject to the antitrust laws those companies with which farmers dealt. For example, the Senate rejected[26] an amendment[27] proposed by Senator Phipps that would have extended the shelter of Capper-Volstead to companies such as sugar refineries that entered into pre-planting contracts with farmers. Senator Phipps's proposal generated this exchange on the floor:

> Mr. KELLOGG. Mr. President, I hope this amendment will not be adopted. It permits any manufacturer who converts a product into a finished commodity where the price paid by the manufacturer to the producer is controlled by or dependent upon the price received by the manufacturer for the finished product to enter into any combination he sees fit. *Of course, if they make contracts with the producers of the raw materials, the packers, the sugar manufacturers, or anybody manufacturing anything where the raw product is produced on the farms can combine under this bill.*
>
> If the Senate wishes absolutely to defeat the bill, it ought to adopt this amendment; otherwise not.
>
> Mr. PHIPPS. Mr. President, will the Senator yield?
>
> Mr. KELLOGG. I yield.
>
> Mr. PHIPPS. I desire to call attention to the fact that this amendment is limited to cases where the manufacturer enters into a contract with the producer before the produce has been grown.
>
> Mr. KELLOGG. I can answer that. That is perfectly easy to do. *The packers could enter into contracts, the cotton mills could enter into contracts; and I hope the Senate will defeat the amendment.*[28]

---

**23.** 62 Cong.Rec. 2058 (1922).

**24.** H.R.Rep.No.24, 67th Cong., 1st Sess. 2 (1921).

**25.** 62 Cong.Rec. 2051 (1922).

**26.** 62 Cong.Rec. 2275 (1922).

**27.** The amendment would have inserted the following language after "nut or fruit growers": and where any such agricultural product or products must be submitted to a manufacturing process, in order to convert it or them into a finished commodity, and the price paid by the manufacturer to the producer thereof is controlled by or dependent upon the price received by the manufacturer for the finished commodity by contract entered into before the production of such agricultural product or products, then any such manufacturers may.

62 Cong.Rec. 2273 (1922).

**28.** 62 Cong.Rec. 2274 (1922) (emphasis added).

Although we concede that there are differences between the contractual arrangement prevalent in the broiler industry and the arrangements that would have been covered by the Phipps Amendment, we are convinced that the nature of the opposition to that Amendment is instructive here as evidence that the Capper-Volstead Congress would not have considered NBMA integrators "farmers," but instead would have grouped them with the packers, the cotton mills, and the sugar refineries.

Congress's determination to circumscribe carefully the coverage of the Act is reflected in other parts of the legislative history as well. For example, the House Report stated:

> Section 1 defines and limits the kind of associations to which the legislation applies. These limitations are aimed to exclude from the benefits of this legislation all but actual farmers . . . .[29]

Reading "farmers" in its ordinary sense as meaning those who own or operate farms focuses the benefits of the Act more closely on the persons central to Congress's concern and it keeps subject to the antitrust laws those companies that prepare farm products for market.

### C. *The Fabric of Other Law*

The language and legislative history of Capper-Volstead support the government's position. NBMA contends, however, that the government's reading of "farmers" is at odds with the treatment of broiler integrators and similar entities under other statutes and regulations.[30] The contention is unavailing. First, broiler integrators and like companies have not fared nearly so well under other statutory schemes as the NBMA contention suggests.[31] Second, none of the other statutes or regulations mentioned by NBMA involves the important national commitment to free competition embodied in the antitrust laws.[32] We are wary of transplanting results from one statutory scheme to another, because policies may vary, and even where policies seem the same, different countervailing interests may affect the extent to which Congress intends to effectuate the policies.[33]

NBMA relies heavily on results under the Fair Labor Standards Act (FLSA)[34] and

**29.** H.R.Rep.No.24, 67th Cong., 1st Sess. 1 (1921). And see note 15 *supra*.

**30.** Representative of the decisions cited by NBMA are *NLRB v. Strain Poultry Farms, Inc.*, 405 F.2d 1025 (5th Cir. 1969) (Fair Labor Standards Act); *United States v. Chemell*, 243 F.2d 944 (5th Cir. 1957) (Treasury Regulations); and *Agricultural Transport Ass'n v. United States*, 274 F.Supp. 528 (N.D.Tex.1967) (Interstate Commerce Act). NBMA also mentions a decision of the New Orleans Bank for Cooperatives to extend credit, Brief for NBMA at 47; a decision of the Secretary of Agriculture regarding a turkey marketing order, 27 Fed.Reg. 3326–54 (1962); a Cost of Living Council Decision, Brief for NBMA at 50; and a recent state court decision in Maine, *Maine Agricultural Marketing Ass'n v. Maplewood Poultry Co.*, Civ.No. 559 (Super.Ct.Me., Kennebec SS. 1971).

**31.** In addition to the Fair Labor Standards Act decisions cited in the text, *infra*, *see, e. g.*, *Parks v. Federal Crop Ins. Corp.*, 416 F.2d 833 (7th Cir. 1969); *United States v. Elm Spring Farm, Inc.*, 38 F.Supp. 508 (D.Mass.1941), *mod-ified on other grounds*, 127 F.2d 920 (1st Cir. 1942).

**32.** *See e. g., Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

**33.** *See United States v. Sisson*, 399 U.S. 267, 297–98, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970); *United States v. Stewart*, 311 U.S. 60, 69, 61 S.Ct. 102, 85 L.Ed. 40 (1940); *Lane v. Railroad Retirement Bd.*, 185 F.2d 819, 822 (6th Cir. 1950). In *FTC v. Bunte Bros.*, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881 (1941), the Court stated:
> Translation of an implication drawn from the special aspects of one statute to a totally different statute is treacherous business. The Interstate Commerce Act and the Federal Trade Commission Act are widely disparate in their historic settings, in the enterprises which they affect, in the range of control they exercise, and in the relation of these controls to the functioning of the federal system.

*Id.* at 353, 61 S.Ct. at 582.

**34.** 29 U.S.C. § 201 *et seq.*

stresses particularly a panel decision of this court, *NLRB v. Strain Poultry Farms, Inc.*, 405 F.2d 1025 (5th Cir. 1969). In *Strain*, we held that a broiler integrator was a raiser of poultry within the meaning of the agricultural exemption in the FLSA.[35] The *Strain* decision is no longer good law. In *Bayside Enterprises, Inc. v. NLRB*, —— U.S. ——, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977), the Supreme Court held that the National Labor Relations Board's position on the issue must be sustained. The NLRB squarely and consistently has held:

> when an employer contracts with independent growers for the care and feeding of the employer's chicks, the employer's status as a farmer engaged in raising poultry ends with respect to those chicks.

*Imco Poultry, Division of International Multifoods Corp.*, 202 N.L.R.B. 259, 260 (1973). Thus, the government's interpretation of Capper-Volstead is consistent with the treatment accorded broiler integrators by the NLRB.

The Secretary of Labor long has held that employees of broiler integrators are not agricultural employees within the meaning of FLSA. A Labor Department regulation states:

> Feed dealers and processors sometimes enter into contractual arrangements with farmers under which the latter agree to raise to marketable size baby chicks supplied by the former who also undertake to furnish all the required feed and possibly additional items. Typically, the feed dealer or processor retains title to the chickens until they are sold. Under such an arrangement, the activities of the farmers and their employees are clearly within section 3(f). The activities of the feed dealer or processor, on the other hand, are not 'raising of poultry' and employees engaged in them cannot be

considered agricultural employees on that ground.[36]

We note these results under the labor laws because they show at least that the government's position is no aberration. To be sure, integrators have had some success in pressing their claim to be farmers.[37] It is sufficient answer that we find nothing in these results under different schemes that compels an interpretation of Capper-Volstead that is contrary to the interpretation suggested by the language and legislative history of the Act. Blind obeisance to consistency is no virtue if it takes us from our primary duty to work the will of the elected representatives of the people, and such obeisance would be strange indeed here, as there is no real consistency to obey.

## III. CONCLUSION

NBMA's position that the Capper-Volstead Act should be brought up to date to take account of the complex structure of modern agriculture [38] rests on fundamental misconceptions of the Congressional purpose revealed in the language and legislative history of the Act and of the role of the judiciary in a democratic society.

The language and legislative history of Capper-Volstead make quite clear that Congress had no purpose to shelter from the laws of free competition the whole spectrum of agricultural enterprise. We may be certain that even in 1922 the agricultural economy had begun to evolve into the intricate thing it now is, yet Congress carefully limited the benefits of the Act to "farmers," and the legislative history reinforces our inclination to give the word its ordinary meaning.

When a court takes account of changed reality in interpreting statutes, the

---

**35.** 29 U.S.C. § 203(f).

**36.** 29 C.F.R. § 780.126.

**37.** *See* note 30 *supra*.

**38.** Brief for NBMA at 26, 31.

goal remains effectuation of Congressional purpose, not alteration of it. If there are good reasons why broiler integrators should be protected against the general national policy of free competition, then NBMA should present those reasons to Congress.[39]

REVERSED.

39. Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944).